NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

:
BUCK FOSTON's NEW BRUNSWICK,     :
LLC, LAWRENCE D. BLATTERFEIN,    :
and FOSTON'S NEW BRUNSWICK       :
REALTY, LLC,                     :
                                 :        Civil Action No. 11-03731(FLW)(TJB)
                  Plaintiffs,    :
                                 :              **OPINION**
        v.                       :
                                 :
JAMES M. CAHILL, INDIVIDUALLY and:
as Mayor of the City of New Brunswick, :
New Jersey, ROBERT RECINE,       :
Individually and as President of the New :
Brunswick City Council, KEVIN P. EGAN, :
Individually and as a member of the New :
Brunswick City Council, and CITY OF :
NEW BRUNSWICK, New Jersey,       :
                                 :
                  Defendants.    :
_____ :

**WOLFSON, United States District Judge:**

Before the Court is a Motion for Summary Judgment by Defendants James M. Cahill ("Mayor Cahill"), Robert Recine ("Councilman Recine"), Kevin P. Egan ("Councilman Egan"), and the City of New Brunswick, New Jersey (collectively, "Defendants"), to dismiss the Federal and New Jersey State constitutional claims of Plaintiffs, Buck Foston's New Brunswick LLC ("Buck Foston's LLC"), Lawrence D. Blatterfein, and Foston's New Brunswick Realty LLC ("Foston's Realty") (collectively, "Plaintiffs"). Buck Foston's LLC, a New Jersey limited liability company, was formed by Mr. Blatterfein to own and operate a restaurant and sports bar to be named "Buck Foston's" in the City of New Brunswick. Plaintiffs claim that Defendants'

alleged delay in the review and then denial of Buck Foston's LLC's application for a liquor license transfer: (1) were in retaliation for Plaintiffs' exercise of commercial speech protected by the First Amendment in naming their proposed restaurant "Buck Foston's"; (2) deprived Plaintiffs of the equal protection of law under the Fourteenth Amendment by treating the application differently than those of other similarly situated bars/restaurants; and (3) violated the corresponding provisions of the New Jersey State Constitution (Article I, Paragraph 6, and Article I, Paragraph 1, respectively).

Defendants have moved for summary judgment on all of Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 56, arguing that (1) Plaintiffs fail to state a cognizable claim for violation of First Amendment rights because they produce no evidence of a causal link between Plaintiffs' protected conduct and the alleged retaliation by Defendants; (2) Plaintiffs fail to state a cognizable claim for violation of equal protection rights because they produce no evidence of similarly situated entities; and (3) the parallel state constitutional claims should be dismissed because Plaintiffs' federal claims are meritless. In addition, Defendants move to dismiss all claims brought by Foston's Realty and Mr. Blatterfein, individually, for lack of standing.

For the reasons that follow, this Court finds that (i) Mr. Blatterfein has standing; (ii) Foston's Realty does not have standing, and thus, it will be dismissed as a plaintiff; (iii) all claims against Defendant Egan are dismissed; (iv) summary judgment is granted in favor of Defendants Cahill, Recine, and City of New Brunswick as to Plaintiffs' federal and state equal protection claims as well as Plaintiffs' federal and state First Amendment retaliation claims arising from the conduct of the New Brunswick Police Department in allegedly delaying the consideration of Plaintiffs' liquor license transfer application; and (v) the Motion for Summary

Judgment by Defendants Cahill, Recine, and City of New Brunswick is denied as to Plaintiffs' First Amendment retaliation claim arising from the denial of Plaintiffs' liquor license transfer application.

I. Factual Background

The following facts are undisputed, unless otherwise noted:

Sometime in the spring of 2009, Mr. Blatterfein identified the site of a former Bennigan's restaurant at the intersection of Routes 1 and 18 in New Brunswick, New Jersey (the "Bennigan's Property") as a potential location for a new restaurant and sports bar to be named "Buck Foston's." [Statement of Material Facts, ¶ 7, hereinafter "Facts"]. In the fall of 2010, at a Rutgers football game, Mr. Blatterfein first discussed the idea of opening a bar/restaurant on the Bennigan's Property with Councilman Recine, the President of the New Brunswick City Council. [Transcript of Recine, T9:6-11, hereinafter "Recine Dep."]. During that conversation, Mr. Blatterfein indicated that as part of the "Buck Foston's" project he desired to change the layout of the Bennigan's Property to include fewer tables so as to accommodate a dance floor. Councilman Recine "expressed his displeasure" with the proposed change to the floor plan and indicated that he was not in favor of the Bennigan's Property being used as a bar. [Transcript of Blatterfein, T44:1-18, hereinafter "Blatterfein Dep."; Facts, ¶ 24].

Moving forward with his development plan, Mr. Blatterfein entered into a contract with JLS Corp, the current owners of the Bennigan's Property, to purchase the site for $1,500,000. [Contract for Sale of Real Estate dated January 31, 2011, hereinafter "Real Estate Contract"]. Prior to the closing of the Real Estate Contract, Mr. Blatterfein and Buck Foston's LLC, jointly,

obtained a guaranteed Small Business Administration loan from Provident Bank in the amount of $2,634,800. [Provident Bank Loan Commitment dated January 13, 2011, hereinafter "Loan Commitment"]. The loan was to finance the purchase of the Bennigan's Property, development costs, and the purchase of a liquor license. Most importantly for the present action, the Real Estate Contract with JLS was made contingent upon Plaintiffs obtaining the loan from Provident Bank within 45 days of the execution of the contract. [Real Estate Contract, ¶¶ 5, 6, 22(a)]. The loan from Provident Bank was, in turn, made contingent upon Plaintiffs obtaining a liquor license transfer approved by the City, as explained below. [Loan Commitment, 3; Letter from Schiller & Pittenger, P.C. to Clarkin dated March 29, 2011, at 4].

In order to operate a bar within the City of New Brunswick, Plaintiffs were required to obtain a liquor license. Only a finite number of licenses are authorized, and at the time Mr. Blatterfein was planning the "Buck Foston's" project, all New Brunswick licenses had already been issued to other businesses. For the project to move forward, Mr. Blatterfein had to locate a liquor license owner willing to sell its license, and to file an application with the City to approve the transfer of the license's ownership ("person-to-person transfer") and of the place at which the license could be used ("place-to-place transfer"). Under the City of New Brunswick's form of government, the City Council is responsible for deciding liquor license transfer applications by majority vote. [Recine Dep., T24:8-10].  Mr. Blatterfein located a willing liquor license seller, Sapporo, another New Brunswick area business, and contracted to purchase its license for $160,000, with $16,000 to be paid as a down payment. [Agreement to Sell Alcoholic Beverage License dated January 8, 2011].

On April 5, 2011, Buck Foston's LLC filed an application with the City to transfer ownership of the Sapporo liquor license to Buck Foston's LLC and to transfer the license location to the Bennigan's Property. [Blatterfein Dep., T39:14-16; Clarkin Letter dated April 5, 2011, Re: Plenary Retail Distribution License]. Also during the first week of April, 2011, Mr. Blatterfein's attorney, James Clarkin, discussed the "Buck Foston's" project with Mayor Cahill, the Mayor of New Brunswick. During that conversation, Mayor Cahill expressed his approval of the project from the perspective of "zoning," "landing," and "economic development," because the otherwise vacant Bennigan's lot would be put to productive use. In the same conversation, however, the Mayor "expressed serious dissatisfaction" with the name "Buck Foston's." He indicated that he found the name offensive because of the play on letters. [Transcript of Clarkin, T16:2-8, hereinafter "Clarkin Dep."].

On April 20, 2011, Mr. Blatterfein personally met with Mayor Cahill to discuss the Buck Foston's project, at which time Mayor Cahill again voiced his displeasure, informing Mr. Blatterfein that he "didn't like" the name "Buck Foston's." [Transcript of Cahill, T85:9-14, hereinafter "Cahill Dep."]. The Mayor believed that the name was inappropriate for the venue, indicating that the play on letters was a "cheap stunt." [Cahill Dep., T79:10-16; Blatterfein Dep. T72:6-11, 16-17]. By Mr. Blatterfein's estimation, of the thirty or forty minute long meeting with the Mayor "what seemed like [fifteen] minutes" was devoted to discussion of the Mayor's disapproval of the name "Buck Foston's." [Blatterfein Dep., T72:6-11, 16-17]. Mr. Blatterfein left the meeting believing that Mayor Cahill opposed the project based solely upon its name.

On May 25, 2011, Glenn Patterson, New Brunswick's Director of Planning, Community and Economic Development, prepared a memorandum addressed to Mayor Cahill, identifying

"[s]ome issues you should be aware of" concerning Buck Foston's LLC's liquor license transfer application ("the Application"). The Application, as filed on April 5, 2011, requested an increase in approved occupancy for the Bennigan's Property from 185 to 393 persons [May 25, 2011, Bennigan's/Buck Foston Memorandum at 2, hereinafter "May 25 Memorandum"]. This increase required a change of the internal layout of the former Bennigan's building to replace seating areas around tables with open spaces for standing only. [Proposed Renovation to Existing Building by James P. Kissane, Architect]. Patterson indicated that the changed floor plan did not create a violation of zoning standards, and that he had asked Mr. Blatterfein's attorney for an updated floor plan to assess whether there were any other changes that might result in a violation of city ordinances. [May 25 Memorandum]. Two weeks later, Kenneth Krug, the City official responsible for ensuring that liquor license applicants' facilities complied with the New Jersey Uniform Construction Code, reviewed the same floor plan discussed by Mr. Patterson in the May 25 Memorandum. Mr. Krug approved the change in layout, provided that Buck Foston's LLC agreed to accept a reduced maximum occupancy of 352 persons. Mr. Krug believed that this reduced level of occupancy was not only compliant with City ordinances, but safe for the public. [Transcript of Krug, T6:20-25, 12:14-22, 16:13-21, hereinafter "Krug Dep."]. After Mr. Krug's approval, Buck Foston's LLC amended the Application to request an occupancy of 352 persons.

By June 9, 2011, Buck Foston's LLC had secured all of the required recommendations necessary to submit its liquor license transfer application to the City Council, except for that of the New Brunswick Police Department. [Plaintiffs' Exhibit W: Certification of Zoning Compliance and Recommendations of Application Status] (The Application received zoning approval on June 9, construction approval on May 24, fire approval on June 9, and legal approval on June 2). On June 15, 2011, Councilman Recine called Mayor Cahill to discuss the "Buck

Foston's" project. During the conversation, Councilman Recine requested to meet with the Mayor to discuss the matter further. [Recine Dep., T70:19-25, 71:1-2].

Following Councilman Recine's request, Mayor Cahill, Councilman Recine, and Mr. Patterson met on June 16, 2011, to discuss the Buck Foston's Project. [Cahill Dep., T113:1-10, 117:9-13]. It is undisputed that no similar meeting between Defendants Cahill and Recine has ever occurred in conjunction with a liquor license transfer application. [Cahill Dep., T117:16-21]. In his deposition, Mr. Patterson stated that the purpose of June 16 meeting was to discuss concerns related to the "Buck Foston's" Application. [Patterson Dep., 25:19-23]. Mayor Cahill and Councilman Recine agreed that the meeting's only purpose was to discuss the "Buck Foston's" Application, with the Mayor further clarifying after the fact that the Application was indeed the only thing discussed at the meeting. [Recine Dep., T54:20-23; Cahill Dep., T117:9-13].

Later that same day, Mr. Patterson prepared a second, 5-page memorandum addressed to Mayor Cahill and Councilman Recine. The memorandum discussed, *inter alia*, the legal standards governing restraint of commercial speech. [June 16, 2011, Buck Foston's Memorandum, hereinafter "June 16 Memorandum"]. Specifically, of the relevant sections, roughly three pages are concerned with zoning and the liquor licensing process generally, and one page addresses municipal ordinances restricting business signage and United States Supreme Court case law on government restriction of commercial speech. *Id.* In drafting the memorandum, Mr. Patterson emphasized certain sentences in each of the sections by underlining them and placing them in bold. In the section discussing commercial speech, Mr. Patterson emphasized that "**[a]ny governmental restraint must advance a substantial public interest**

**and must not be more extensive than necessary to serve that interest**," and "**unless speech regulations target false, misleading or coercive advertising, or require disclosure of information that will help avoid misleading advertising, strict First Amendment scrutiny should apply**." *Id*. (emphasis in original). In his deposition, Mr. Patterson testified that he included the discussion of signage and commercial speech because "the issue of signage and the name ["Buck Foston's"] had come up" during the June 16 meeting. [Transcript of Patterson, T65:24-25, 66:1-22, hereinafter "Patterson Dep."]. It is undisputed that no similar memoranda have ever been produced in conjunction with a liquor license transfer application in New Brunswick. [Patterson Dep., T53:25, 54:1-25, 55:1-9].

In the months following the submission of Plaintiffs' Application, Mayor Cahill spoke with Director Patterson on approximately ten occasions about Buck Foston's, including one or two in which, the name "Buck Foston's," as distinguished from other concerns about the "Buck Foston's" project, was discussed. [Patterson Dep., T24:4-11, 24:15-25, 25:1-4].

By late June, 2011, the Police Department had not yet concluded its background check of Mr. Blatterfein, and Buck Foston's LLC's Application had not yet received the Department's recommendation. Both were necessary before the Application could be considered by the City Council. Mr. Blatterfein found the delay in the background check particularly troubling, because he was already a liquor license holder in the City of New Brunswick, having previously passed the Police's background check, and had received reapproval for his other New Brunswick Property, "KnightClub," on June 14, 2011. [Amended Complaint, ¶ 3; Plaintiffs' Exhibit U, Clarkin Declaration, ¶ 9]. On June 29, 2011, Plaintiff, filed the present lawsuit, including only claims against Mayor Cahill and City of New Brunswick for the delay of Mr. Blatterfein's

background check and the Police Department's recommendation concerning Buck Foston's LLC's Application. In their initial pleadings, Plaintiffs did not allege any conduct by the City Council, because the Council had not yet acted, and the Application was not yet complete for its review. It was not until July 14, 2011, that Buck Foston's LLC submitted its Tax Certificate to the New Brunswick Police Department, rendering its Application otherwise complete. [DeBonis Letter dated August 2, 2011].

Although absent from the record, it is undisputed that Defendant City of New Brunswick indicated that Plaintiffs' Application would be put on the agenda for the August 17 City Council meeting on August 12, 2011. [Defendants' Response Brief, 10; *accord* Amended Complaint, ¶ 56]. Police Chief Anthony Caputo, on behalf of the New Brunswick Police Department, in a letter dated August 16, 2011, recommended approval of the Application's requested person-to-person transfer, but denial of the place-to-place transfer, citing as his reasons (1) the proposed increase in occupancy over that of the Bennigan's restaurant that previously operated at the Property, and (2) the configuration of the interior layout. [Recine Dep., T15:20-16:10; Police Department's Recommendation of Applicant Status dated August 16, 2011].[1] In other words, the Police Department approved transferring the liquor license from its current owners to Buck Foston's LLC, but recommended against allowing the license to be used at the Bennigan's Property. Although it is disputed whether Plaintiffs were unable to publish the required public notices for their application to be heard at the August 17 meeting, or simply failed to do so, in either case, no notice was timely filed, and the City Council did not hear Plaintiffs' Application

---

[1] While Chief Caputo approved and signed the final recommendation, the investigative work and the initial formulation of the recommendation were conducted by Detective DeBonis. Accordingly, it was Det. DeBonis who determined that there were occupancy and layout concerns and cautioned against granting the Application; Det. DeBonis also delivered the Department's recommendation to the Council during the September 7 meeting.

in August. Instead, the public hearing for the Application was rescheduled for the next City Council meeting in September.

Plaintiffs' Application was finally considered by the New Brunswick City Council on September 7, 2011. Three members of the Council were present and considered the Application. Detective DeBonis testified that the higher occupancy load for the Bennigan's Property proposed by Buck Foston's LLC would increase traffic in the area of the Property and cause a public safety issue. [Council Meeting Hearing Transcript, September 7, 2011, at T27-29, hereinafter "Council Meeting Tr." ("We[, the Police Department,] believe that the 352 occupants . . . will adversely affect the quality of life in the area and traffic safety.")]. Detective DeBonis's findings were based, at least in part, on an accident and traffic study he had conducted on the area around the Bennigan's Property in preparation for the Council Meeting. *Id.* At the same meeting, Plaintiffs submitted for the Council's consideration, the letter of approval of Kenneth Krug, a licensed fire protection and electrical subcode official for the City, in charge of reviewing proposed development projects for compliance with the New Jersey Uniform Construction Code. Krug's approval indicated that the Buck Foston's project complied with the city's fire and electrical safety ordinances. [Krug Dep., T6:20-25, 11:7-13]. Plaintiffs also submitted a "Letter of No Interest" from the New Jersey Department of Transportation, stating of the Bennigan's Property that "a significant increase in traffic will not be created by the redevelopment of the high-turnover restaurant." [Richard C. Dube, Letter Re: NJDOT Letter of No Interest dated September 1, 2011]. Plaintiffs also submitted a letter by two professional traffic engineers from

the Atlantic Traffic Center supporting the Department's conclusion. [John R. Harter, Atlantic Traffic Letter, Letter to Clarkin dated September 7, 2011].[2]

At the close of the meeting, Councilmen Recine and Egan voted to grant Buck Foston's LLC's person-to-person transfer of the Sapporo liquor license to Mr. Blatterfein and his business partner, but voted to deny the place-to-place transfer. Both councilmen cited their concerns about proposed changes to the internal layout of the building and the increased traffic in the area resulting from the higher occupancy as their reasons for denying the place-to-place transfer. [Recine Dep., T43:2-4, 46:1-9; Transcript of Egan, T9:4-12, 7:10-23, hereinafter "Egan Dep."].[3] The only other councilperson in attendance voted to approve both the person-to-person and the place-to-place transfers. [Council Meeting Hearing Tr., T57:18]. Thus, Plaintiffs' Application was denied by a 2-1 vote.

Plaintiffs allege that Mayor Cahill "intentionally interfered with the application and background check process based on his dislike of the name "Buck Foston's." [Amended Complaint, ¶ 39]. They further allege that in the period during which the background check process was delayed, Mayor Cahill and Councilman Recine "desperately tried to identify any excuse to deny Plaintiffs' liquor license." [Amended Complaint, ¶ 40]. Plaintiffs further allege that Councilmen Recine and Egan "at the request of and/or in coordination with Mayor Cahill

---

[2] While he had read over Mr. Krug's approval, Councilman Recine did not read either the letter of the NJDOT or that of Plaintiffs' retained engineering firm before voting on the Application. [Recine Dep., T86:20-23, 89:4-8]. There is no evidence in the Record whether either of the other council members present read or did not read the letters. It is undisputed, however, that Recine was aware of all three letters. Mr. Clarkin spoke at the Council Meeting laying out all of the support for Plaintiffs' Application. [Transcript of September 7 City Council Meeting, T14:24-26:9].

[3] It is undisputed that Councilman Recine never before publicly voiced concerns about traffic in the area. [Recine Dep., T24:4].

and/or the City" had predetermined and agreed to vote in favor of the person-to-person transfer, but to vote against the place-to-place transfer, and to cite traffic and occupancy concerns as their reasons for so voting. Thus, Plaintiffs contend that these defendants conspired to create a pretextual explanation to conceal their true motive for denying the Application, which was to preclude a restaurant with the "offensive" name "Buck Foston's" from opening in the City of New Brunswick. [*Id.*].

II. Procedural History

On June 29, 2011, while Plaintiff Buck Foston's LLC's liquor license transfer application was still pending, Plaintiffs filed their original Complaint against Defendants Cahill and City of New Brunswick, alleging unconstitutional delay in the processing of Plaintiffs' Application. On August 2, 2011, Plaintiffs filed a motion for a temporary restraining order and/or preliminary injunction against the City of New Brunswick to compel the completion of the background check procedure. Before the disposition of the motion, the New Brunswick Police Department completed its background check and the New Brunswick City Council voted to deny Plaintiff Buck Foston's LLC's liquor license transfer application. On October 4, 2011, this Court entered an Order dismissing as moot Plaintiffs' request for a preliminary injunction and restraining order and opened fact discovery. On December 13, 2011, Plaintiffs filed an Amended Complaint against all Defendants, alleging denial of equal protection under the law and retaliation for the exercise of First Amendment rights arising from the denial of Plaintiffs' Application. Defendants filed an Answer to the Amended Complaint on January 23, 2012. Discovery on all issues

concluded on January 11, 2013. Subsequently, Defendants filed the present Motion for Summary Judgment on all claims.

III. Local Rule 56.1

As a preliminary matter, Plaintiffs argue that Defendants' Motion for Summary Judgment should be denied based on the absence of a separate Rule 56.1 statement. New Jersey Local Civil Rule 56.1(a), as amended in 2008, requires that on a motion for summary judgment, both the moving and non-moving parties furnish a separate statement identifying what each side deems to be the material facts. These statements assist the Court in determining whether a genuine dispute exists. As noted in the Rule's commentary, "the requirement of a separate document represents a change from the practice under the former version of the rule [and] . . . is viewed by the Court as a vital procedural step, since it constitutes and is relied upon as a critical admission of the parties." The commentary specifies that the assertions in each statement must be set out in separately numbered paragraphs, and each fact alleged must be supported by a specific citation to an affidavit. N.J. Loc. Civ. Rule 56.1 cmt.

The consequences of a movant's noncompliance with Rule 56.1(a) can be severe—"[a] motion for summary judgment unaccompanied by a statement of material facts not in dispute shall be dismissed." L. Civ. R. 56.1(a). *See also Kee v. Camden County*, 2007 U.S. Dist. LEXIS 23637 (D.N.J. 2007) (Simandle, Jr.); *Langan Eng'g & Envtl. Servs. v. Greenwich Ins. Co.*, 2008 U.S. Dist. LEXIS 99341 (D.N.J. 2008) (Greenaway, J.). A court may, however, excuse the failure to submit a Rule 56.1 statement where there is no evidence of bad faith. *See, e.g., Shirden*

*v. Cordero*, 509 F. Supp. 2d 461, 463–64 n .1 (D.N.J. 2007) (Martini, J.) (stating "lack of compliance with the Local Civil Rules has made it difficult and time-consuming for the Court to determine whether a genuine issue of material fact exists. Nonetheless, the Court, having found no evidence of bad faith, will decide Defendants' motion on its merits").

Here, while Defendants' statement of material facts is contained within Defendants' brief in support of the Motion for Summary Judgment and is labeled "Statement of Facts," it otherwise substantially complies with the requirements of Rule 56.1. The Statement of Facts is presented in numbered paragraphs and includes appropriate citations to the record. There is no indication that Defendants' failure to separately submit a document titled "Statement of Material Facts," stemmed from an impermissible purpose or otherwise was done in bad faith. The substantially compliant nature of Defendants' Motion supports this conclusion. Thus, while Defendants' submission does not strictly comply with every requirement of Rule 56.1, it is nevertheless within the discretion of this Court to consider Defendants' Motion. I find that such a result is in the interests of justice.

IV. Standard of Review

A. Jurisdictional Challenge Standard – Fed. R. Civ. P. 12(b)(1)

Federal Rule of Civil Procedure 12(b)(1) permits a party to bring a motion to dismiss for want of standing. *See Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007). At the summary judgment stage of a proceeding, the plaintiff "bears the burden of establishing the elements of standing, and each element must be supported in the same way as any other matter

on which plaintiff bears the burden of proof." *FOCUS v. Allegheny County Court of Common Pleas*, 75 F.3d 834, 838 (3d Cir. 1996) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). Plaintiffs must therefore demonstrate jurisdiction in accordance with the summary judgment standard enunciated below.

B. Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 482 n. 1 (3d Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *accord* Fed. R. Civ. P. 56(c). For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006). For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." *Id.*; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. Once the moving party has met this burden, the non-moving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. *Id.*; *Maidenbaum v. Bally's Park Place, Inc.*, 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the non-moving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *Anderson*, 477 U.S. at 256–57. "A non-moving party may not 'rest upon

mere allegations, general denials or . . . vague statements. . . .'" *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 890 (3d Cir. 1992) (quoting *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991)). Moreover, the non-moving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." *Woloszyn v. County of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005). Indeed, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.

V. Jurisdiction

Pursuant to Article III of the Constitution, federal courts "enforce the case-or-controversy requirement through the several justiciability doctrines that cluster about Article III." *Allen v. Wright*, 468 U.S. 737, 750, (1984) (quoting *Vander Jagt v. O'Neill*, 699 F.2d 1166, 1178–79 (D.C. Cir. 1982) (Bork, J., concurring)). The justiciability doctrines include "standing, ripeness, mootness, the political-question doctrine, and the prohibition on advisory opinions." *See Toll Brothers, Inc. v. Township of Readington*, 555 F.3d 131, 137 (3d Cir. 2009) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).  To satisfy the requirements of the justiciability doctrine of standing, a plaintiff must demonstrate that (1) he or she has suffered an "injury in fact," (2) the injury is "fairly traceable" to the actions of the defendant, and (3) the injury will likely be redressed by a favorable decision. *Svc. Employ v. Municipality of Mt. Lebanon*, 446 F.3d 419, 422 (3d Cir. 2006).

16

Generally, courts must separately address a plaintiff's standing as to each claim asserted in the complaint. *See Municipality of Mt. Lebanon*, 446 F.3d at 422. Where, however, claims challenge the same conduct and allege the same injuries, a claim-by-claim discussion is unnecessary. *Toll Brothers*, 555 F.3d at 139 n. 5. Plaintiffs' First Amendment and Equal Protection claims challenge the same conduct (the allegedly unconstitutional delay and denial of the liquor license transfer application) and, therefore, will be discussed together. Plaintiffs' state law constitutional claims, brought before the Court under its supplemental jurisdiction pursuant to 42 U.S.C. § 1367, also challenge the same conduct and allege the same injuries. They will be considered if standing is found for Plaintiffs' federal claims. The Court will now proceed to address the standing of each Plaintiff in turn.

Defendants do not contest that Buck Foston's LLC has standing to bring the instant claims based upon the denial of its liquor license transfer application. Instead, Defendants challenge Mr. Blatterfein's standing to bring suit in his individual capacity and Foston's Realty's standing, contending that, as the liquor license transfer applicant, only Buck Foston's LLC may bring suit as a result of the Application's denial.

A. Lawrence D. Blatterfein

1. Injury

The Third Circuit has held that the injury-in-fact requirement is often determinative of whether a plaintiff has standing to sue. *Toll Brothers*, 555 F.3d at 139. Injury, in the standing context, must be sufficiently "distinct and palpable" to distinguish the plaintiff from "the generalized and undifferentiated interest every citizen has in good government." *Id.* (citations

omitted). In a recent case addressing this important requirement, the Circuit Court reaffirmed that the "contours of [the injury-in fact requirement], while not precisely defined, are very generous." *Nat'l Collegiate Athletic Ass'n v. Governor of New Jersey*, 13-1713, 2013 WL 5184139 (3d Cir. Sep. 17, 2013) (citing *Bowman v. Wilson*, 672 F.2d 1145, 1151 (3d Cir. 1982)). "Indeed, all that Article III requires is an identifiable trifle of injury, . . . which may exist if the plaintiff 'has . . . a personal stake in the outcome of [the] litigation.' *Id.* (quoting *The Pitt News v. Fisher*, 215 F.3d 354, 360 (3d Cir. 2000)). In this case, Mr. Blatterfein has introduced evidence showing that he has the requisite personal stake in the outcome. He was the signatory on the real estate purchase and financing contracts contingent on the outcome of Buck Foston's LLC's Application, and he expended significant funds preparing the Bennigan's Property for development into "Buck Foston's." Moreover, the Supreme Court has explicitly held that a developer, having entered into a contract to purchase a parcel of land made contingent upon the disposition of an application then pending before a municipal government, has standing to bring suit to recover damages arising from the cancelation of the land purchase contract after the application's denial. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261-62 (1977). The Third Circuit subsequently acknowledged and relied upon the Supreme Court's reasoning in *Arlington Heights*. *See Toll Brothers*, 555 F.3d at 139–40. Bearing in mind the low threshold for injury reaffirmed by the Court in *Nat'l Collegiate Athletic Ass'n*, I find the Supreme Court's reasoning in *Arlington Heights*, as relied upon by the Third Circuit in *Toll Brothers*, controlling in this case.

The developer in *Arlington Heights* entered into two contracts with the owner of a property. The first was a 99–year lease of the property, which went into effect immediately. The second was a land purchase contract, which would only close if the developer convinced the

local zoning board to re-zone the property to permit construction of an apartment building. The zoning board refused to re-zone the property, the developer's contract to purchase the land was therefore canceled, and the developer brought suit challenging the board's decision on equal protection grounds. The Supreme Court, in addressing the developer's standing, ruled that the developer sufficiently alleged injury-in-fact:

> [I]t is inaccurate to say that [the developer] suffers no economic injury from a refusal to rezone, despite the contingency provisions in its contract. [The developer] has expended thousands of dollars on the plans for Lincoln Green and on the studies submitted to the Village in support of the petition for rezoning. Unless rezoning is granted, many of these plans and studies will be worthless even if [the developer] finds another site at an equally attractive price.

*Arlington Heights*, 429 U.S. at 262. Because the developer had a "detailed, specific plan," and exhibited a substantial expenditure of financial resources, the Court was "not required to engage in undue speculation as a predicate for finding that the plaintiff ha[d] the requisite personal stake in the controversy." *Id.* at 261. *See* discussion in *Coastal Outdoor Adver. Grp., LLC v. Twp. of Union, N.J.*, 676 F. Supp. 2d 337, 346-47 (D.N.J. 2009) *aff'd sub nom. Coastal Outdoor Adver. Grp., L.L.C. v. Twp. of Union, N.J.*, 402 F. App'x 690 (3d Cir. 2010).

While it is true that Mr. Blatterfein, in his personal capacity, was not the liquor license transfer applicant, Plaintiffs have shown that Mr. Blatterfein's development of the Bennigan's Property proceeded under a "detailed, specific plan" and that he spent significant funds on the project prior to the Application, amply demonstrating his requisite personal stake in the controversy. Mr. Blatterfein personally signed a "Contract for Sale of Real Estate" to purchase the proposed site of the Buck Foston's restaurant on Route 18 for $1,500,000, [Real Estate Contract]; was a co-borrower, along with Buck Foston's LLC, on a $2,634,800 loan from Provident Bank to finance the project, [Loan Commitment]; and (3) was the sole buyer/owner of

the $160,000 Sapporo liquor license which was the subject of the transfer application. [Agreement to Sell Alcoholic Beverage License]. Mr. Blatterfein's contract to purchase the Bennigan's Property was contingent upon his successfully obtaining financing for the "Buck Foston's" project, and his agreement to secure financing was conditioned upon the approval of Buck Foston's LLC's liquor license transfer application, [Loan Commitment, 3; Letter from Schiller & Pittenger, P.C. to Clarkin dated March 29, 2011].[4] On May 17, 2011, Mr. Blatterfein paid an additional $30,000 to extend the closing date of the land purchase contract to June 30, 2011. [Plaintiffs' Exhibit T: Bennigan's Contract Amendment]. Mr. Blatterfein ultimately delivered two more $30,000 checks to the seller of the Bennigan's Property as the application process stalled. [Plaintiffs' Exhibit S: Bennigan's Contract Amendment]. It is also undisputed that Mr. Blatterfein expended funds (i) to have engineering studies done on the Bennigan's property in preparation for the renovation of the parking lot, (ii) to commission architects to draw up new floor plans for submission to the City, and (iii) to have Phase 1 and Phase 2 environmental testing conducted on the property in preparation for the renovation. [Clarkin Letter, April 5, 2011 Re: Plenary Retail Distribution License]. Accordingly, Mr. Blatterfein's injuries arising from money he spent in connection with contingent land contracts and property specific land studies are sufficiently similar to those of the developer in *Arlington Heights* to warrant a similar finding of injury-in-fact.[5]

---

[4] Mr. Blatterfein's contract to purchase the Sapporo liquor license was not contingent upon the award of the liquor license transfer. After the Application's denial, however, the license had lost most of its value to Mr. Blatterfein, because his only other bar in New Brunswick already had a liquor license. Mr. Blatterfein voluntarily canceled the contract after the denial. [Letter from James F. Clarkin III to Lawrence B. Sachs dated September 12, 2011].

[5] The New Jersey case of *Senna v. City of Wildwood*, 23 N.J. Tax 275 (App. Div. 2006), cited in Defendants' Motion challenging Mr. Blatterfein's standing is inapplicable to this case. That case

2. Traceability

The second element of Article III standing is causation. "If the injury-in-fact prong focuses on *whether* the plaintiff suffered harm, then the traceability prong focuses on who inflicted that harm." *Toll Brothers*, 555 F.3d at 142 (emphasis in original). The key question is whether "the defendant's challenged actions, and not the actions of some third party, caused the plaintiff's injury." *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Moreover, "[the] causal connection need not be as close as the proximate causation needed to succeed on the merits of a tort claim." *Id.* (citing *Pub. Interest Research Group of N.J., Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 72 (3d Cir.1990)).

Here, similar to the purchase option in *Arlington Heights*, Mr. Blatterfein's acquisition of the Bennigan's Property was made contingent upon securing favorable action by the governing body of a municipality. [Real Estate Contract; Boenning Letter dated September 9, 2011]. Because the New Brunswick City Council denied Buck Foston's LLC's liquor license transfer application, Plaintiff's contingent contracts never closed, and the environmental impact studies, engineering plans, and architectural layouts that Mr. Blatterfein had commissioned were rendered useless. Thus, Mr. Blatterfein's injury is reasonably traceable to the action of Defendants.

---

dealt with the requirement of proper legal representation by counsel of an LLC, where the lone shareholder attempted to proceed *pro se* on the LLC's behalf. *Id*. It has no bearing on the parties' standing in this case.

3. Redressability

Redressability is closely related to traceability, "as two sides of a causation coin." *Toll Brothers,* 555 F.3d at 142 (quoting *Dynalantic Corp. v. Dep't of Def.*, 115 F.3d 1012, 1017 (D.C. Cir. 1997)). Whether a "favorable decision [will] alleviate the harm" is the essence of the redressability inquiry. *Id.* (citing *Lujan*, 504 U.S. at 560–61). As long as a plaintiff establishes a "substantial likelihood that the requested relief will remedy the alleged injury in fact," the plaintiff's claim may proceed. *Id.* (citations omitted).

Mr. Blatterfein, personally, seeks compensatory damages resulting from the delay and denial of the liquor license transfer application. The Supreme Court has long held compensatory damages to be an appropriate remedy in civil rights actions:

> [W]hatever the constitutional basis for § 1983 liability, such damages must always be designed to *compensate injuries* caused by the [constitutional] deprivation.

*Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 309-10 (1986) (citations omitted) (emphasis in original). Accordingly, a favorable decision in this case will redress Mr. Blatterfein's injuries. Thus, Mr. Blatterfein has standing to bring the present suit.

B. Foston's Realty

Defendants also challenge Foston's Realty's standing to bring suit on the same grounds raised against Mr. Blatterfein. Foston's Realty is described in Plaintiffs' Amended Complaint as having been created for the purpose of holding the Bennigan's Property after its purchase by Mr. Blatterfein. [Blatterfein Dep., T39:1-5]. Because Mr. Blatterfein paid personally for the Sapporo license, the Bennigan's Property contract extensions, and the preparatory studies on the Property,

the only injury alleged by Foston's Realty is the loss of the opportunity to own the Bennigan's Property. [Plaintiffs' Opposition Brief, 5]. The record shows that Mr. Blatterfein planned to transfer the property to Foston's Realty after the closing of his personal land purchase contract, but reveals no contract or other instrument obligating Mr. Blatterfein to effect the transfer, or otherwise giving Foston's Realty a property interest in the transaction.

Stated differently, Foston's Realty expended no funds in preparation for the Buck Foston's project and possessed neither a financial stake nor a legally enforceable future interest in the Property. Accordingly, the Court finds the injury suffered by Foston's Realty is unlike that of the contingent contract signatory in *Arlington Heights*, or Mr. Blatterfein. Foston's Realty's loss of a potential, future transfer of real property, unaccompanied by other evidence of investment in or ownership of the Buck Foston's project is not a sufficiently "distinct and palpable" injury-in-fact for Article III standing purposes. Because the Court finds that Foston's Realty has suffered no injury-in-fact, no further standing analysis is required and Plaintiff Foston's Realty is dismissed from this action.

VI. First Amendment Retaliation Claim

Before discussing Plaintiffs' retaliation claim at length, I pause to clarify the nature of the claim being made. Plaintiffs assert two instances of alleged retaliation by Defendants as a result of Plaintiffs' exercise of First Amendment rights. First, Plaintiffs contend that Mayor Cahill either directed or conspired with the New Brunswick Police Department to delay Buck Foston's LLC's Application by failing to timely conduct a required background check and by withholding

a required departmental recommendation. Second, Plaintiffs contend that Mayor Cahill either directed or conspired with Councilmen Recine and Egan to deny the Application when it was called up for a vote. Neither Plaintiffs nor Defendants apply the legal standard for § 1983 conspiracy in their briefing of this matter. *See Startzell v. City of Philadelphia*, 2007 WL 172400 (E.D. Pa. Jan. 18, 2007) at *17, *aff'd sub nom. Startzell v. City of Philadelphia, Pa.*, 533 F.3d 183 (3d Cir. 2008) ("To state a claim for conspiracy in violation of § 1983, a plaintiff must allege (1) the existence of a conspiracy involving state action; and (2) a [deprivation] of civil rights in furtherance of the conspiracy by a party to the conspiracy.").[6] Nevertheless, this Court finds that, when viewed together, the many allegations of retaliation included in the Amended Complaint state a claim for conspiracy under § 1983 for both the delay and denial of the Application. *See, e.g.*, Amended Complaint, ¶ 67 ("Defendants . . . had previously agreed" to employ a pretextual explanation for their votes); Amended Complaint, ¶ 78 (Defendants' hatched an "intentional and illegal scheme" to prevent Plaintiffs from using the name "Buck Foston's").

Having so found, the difficulty then arises that, in their filings on this Motion, neither Plaintiffs nor Defendants structure their arguments and factual support at the summary judgment stage according to the § 1983 conspiracy framework. Instead, both concentrate on the three-part

---

[6] To establish (1) the existence of a conspiracy "a plaintiff must show a combination of two or more persons to do a criminal act, or to do a lawful act by unlawful means, or for an unlawful purpose by making specific factual allegations of combination, agreement, or understanding among all or between any of the defendants to plot, plan, or conspire to carry out the alleged chain of events." *Startzell*, 2007 WL 172400 at *17 (citations omitted). Central to this showing are "specific factual allegations that there was a mutual understanding among the conspirators to take actions directed toward an unconstitutional end." *Id.* Because circumstantial evidence may be used to prove a conspiracy, "whether there is a conspiracy is typically a jury question if there is a possibility to infer from the circumstances that the alleged conspirators had a meeting of the minds and thus reached an understanding to achieve the conspiracy's [objectives]." *Id.* (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970) ("To constitute a conspiracy, there must be a 'meeting of the minds.'")).

standard for civil rights retaliation claims. To establish the elements of a retaliation claim predicated on the First Amendment under 42 U.S.C. § 1983, Plaintiffs must show "(1) that they engaged in a protected activity, (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). The third element, "causation," is most frequently disputed, and is indeed the only one of the three elements disputed in the case now before the Court.[7] As explained, *infra*, the evidence introduced by Plaintiffs to show causation under the three-part retaliation test is the *same* evidence supporting Plaintiffs' retaliation claim under a conspiracy theory of liability. By the very nature of the evidence introduced by Plaintiffs, if the record will not support a finding of causation, it also will not support the existence of a conspiracy.

A. Retaliation By Delay of the Background Check and Recommendation

In the Amended Complaint, Plaintiffs attempt to establish Mayor Cahill's liability for the allegedly intentional delays of the New Brunswick Police Department simply by showing that as the City's chief executive, supervision of the police was included among the Mayor's official duties. The Supreme Court long ago rejected this theory of liability in civil rights cases. "'A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons

---

[7] Plaintiffs do not dispute that Plaintiffs can satisfy the first two factors that (1) Mr. Blatterfein's naming of his prospective restaurant "Buck Foston's" was a protected exercise of commercial speech under the First Amendment and (2) that the City Council's denial of Buck Foston's LLC's liquor license transfer application, if retaliatory conduct, would constitute retaliation sufficient to deter a person of ordinary firmness from exercising his First Amendment rights. [Defendants' Motion for Summary Judgment, 9].

properly employed by or under him, in the discharge of his official duties.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (quoting *Robertson v. Sichel*, 127 U.S. 507, 515-516 (1888)). Because vicarious liability is inapplicable to § 1983 suits, to state a First Amendment retaliation claim against Mayor Cahill on the basis of Police Department conduct, a plaintiff "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id*. The Third Circuit has long subscribed to this standard, as made clear in *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998):

> A defendant in a civil rights action must have personal involvement in the alleged wrongs.... [P]ersonal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence. Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity.

Here, while Plaintiffs' Amended Complaint repeatedly alleges direction and influence by Defendant Cahill, this court is constrained to note that this is not a motion to dismiss, where factual allegations are taken as true; but rather, this is a motion for summary judgment, and Plaintiffs have offered no evidence to raise a genuine issue of material fact that Mayor Cahill influenced the Police Department to delay the Buck Foston's Application. While Plaintiffs have introduced evidence establishing Mayor Cahill's role as the chief executive of New Brunswick, his friendship with the Director of the Police Department, and his approval, as Mayor, of the hiring of individual police officers, this showing falls short. [Cahill Dep., T69:15-25, 70:1-7, 68:17-25, 69:1-3]. Plaintiffs have not proffered any evidence, whether by records of electronic communication, writings, or in-person meetings between Mayor Cahill and Detective DeBonis, or any other member of the New Brunswick Police Department, concerning "Buck Foston's." Moreover, they have not shown communication of any kind about "Buck Foston's" between the Mayor and Police Department. This Court notes that direct evidence is generally not forthcoming

in cases of alleged collusion among government officials in meetings closed to the public, but Plaintiffs here have not introduced any circumstantial evidence giving rise to an inference of improper influence over the Police Department by Mayor Cahill. The Plaintiffs have not proffered, for example, entries from Mayor Cahill's office calendar showing meetings scheduled between the Mayor and Detective DeBonis, agendas from regularly scheduled meetings with the Police Department where liquor licenses were slated to be discussed, any email exchanges, or even phone records for the relevant time period.

These same gaps in the record illustrate that Plaintiffs have also failed to show a conspiracy between the Mayor and the Police Department. Not only are there no "specific factual allegations that there was a mutual understanding among the conspirators to take actions directed toward an unconstitutional end," there are no specific factual allegations of communication of any kind between two. *Startzell*, 2007 WL 172400 at *17. The Court also notes that the absence of any evidence in the record concerning any conspiracy involving the Mayor, City Council, *and* Police Department, remains *after* the close of discovery. It is not for lack of opportunity to investigate, therefore, that Plaintiffs fail in making their required showing of either influence or agreement.

In discussing summary judgment in First Amendment retaliation cases, the Third Circuit has explained:

> Although we have often noted that the first prong of the First Amendment retaliation test presents questions of law for the court while the second and third prongs present questions of fact for the jury, *e.g., Curinga v. City of Clairton,* 357 F.3d 305, 310 (3d Cir.2004) (citing *Baldassare,* 250 F.3d at 195), only *genuine* questions of fact should be determined by the jury. For example, in *Ambrose v. Township of Robinson, Pa.,* 303 F.3d 488, 496 (3d Cir.2002), we held that judgment as a matter of law under Rule 50(b) should have been granted to the defendant where the plaintiff failed to present sufficient

> evidence that his protected activity was a substantial factor in his suspension. The same principle applies in the summary judgment context under Rule 56. *E.g., Watters v. City of Philadelphia,* 55 F.3d 886, 892 (3d Cir.1995) (noting District Court concluded that plaintiff made sufficient showing that speech was substantial factor motivating termination to submit question to jury).

*Hill v. City of Scranton*, 411 F.3d 118, 127 (3d Cir. 2005). While Plaintiffs' evidence may be sufficient to show that it was within Mayor Cahill's job description to supervise the New Brunswick Police Department, nonetheless Plaintiffs have failed to show that, in the weeks and months during which Buck Foston's LLC's Application was being considered, the Mayor "personally directed" or possessed "actual knowledge" of *and* acquiesced in the delay of Plaintiffs' background check or the Department's recommendation. In short, Plaintiffs have failed to show the required causal connection between Mayor Cahill's disapproval of the name "Buck Foston's" and the allegedly retaliatory delay of Buck Foston's LLC's Application. At the same time, the absence of direct or circumstantial evidence showing communications about the Buck Foston's project between the Mayor and Police Department make a finding of the "meeting of the minds" required for a conspiracy impossible. Accordingly, observing the Third Circuit's decision in *Hill* along with the substantial discovery already conducted in this case, this Court grants summary judgment in favor of Defendant Cahill on Plaintiffs' First Amendment Retaliation claim against him on the basis of the conduct of the Police Department. The Court does not need to address Plaintiffs' claim arising from the alleged delay of the Application as to Defendants Recine and Egan, because Plaintiffs have not alleged, and the record contains no evidence to support, any connection between Councilmen Recine and Egan and the New

Brunswick Police Department.  Because there is no underlying liability for any of the City

officials, there is also no municipal liability on this basis for the City of New Brunswick.[8]


B. Retaliation By Denial of the Application

While the absence of evidence supporting Plaintiffs' delay claim, *supra*, made analysis

according to the Third Circuit's three-part test for causation in retaliation cases unnecessary,

Plaintiffs have introduced substantial evidence in support of their denial of the liquor license

application claim, requiring closer review. To establish causation, the Third Circuit has

explained that a "plaintiff usually must prove either (1) an unusually suggestive temporal

proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of

antagonism coupled with timing to establish a causal link." *DeFlaminis*, 480 F.3d at 267. The

Circuit has also provided a catch-all standard that "in the absence of . . . proof [under either

foregoing theory] the plaintiff must show that from the 'evidence gleaned from the record as a

---

[8] Plaintiffs have not named Det. DeBonis or any other officer of the New Brunswick Police
Department as defendants in this action. Nevertheless, at least once in the Amended Complaint,
Plaintiffs argue that the Police Department may have acted to delay the Application because of
its own bias against the name "Buck Foston's," independent of Mayor Cahill. As explained,
*infra*, however, the Supreme Court has long held that there is no vicarious municipal liability in §
1983 cases. Instead, "[a] plaintiff seeking to impose liability on a municipality under § 1983
[must] identify a municipal policy or custom that caused the plaintiff's injury." *Kriss v. Fayette
Cnty.*, 504 F. App'x. 182, 187 (3d Cir. 2012) (citing *Bd. of Cnty. Comm'rs of Bryan Cnty. v.
Brown*, 520 U.S. 397, 403 (1997)).
    Plaintiffs have not introduced any evidence suggesting that the actions of Det. DeBonis
or any other police officer involved in the liquor license transfer review process were motivated
to delay Plaintiffs' Application by a municipal policy against "offensive" names or that there was
a pattern or practice within the police department of delaying the applications of businesses with
disfavored names such that the practice could be imputed to the municipality as its official
policy. Without some showing by Plaintiffs permitting a trier of fact to infer that the Police
Department's conduct stemmed from an explicit or implied municipal policy or custom, there is
no municipal liability for the City of New Brunswick.

whole' the trier of fact should infer causation." *Id.* (citing *Farrel v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)).

Regarding the first theory, while there is no hard and fast standard for "unusually suggestive temporal proximity," the Third Circuit has found "that such an inference could be drawn where two days passed between the protected activity and the alleged retaliation, *see Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989), but not where 19 months had elapsed, *see Krouse*, 126 F.3d [494,] . . . 503 [(3d Cir. 1997)]." *Estate of Smith v. Marasco*, 318 F.3d 497, 512-13 (3d Cir. 2003). To establish causation under the second, "antagonism" theory, a plaintiff needs "to show 'actual antagonistic conduct or animus' in 'the intervening period' between the protected activity and the retaliation." *Id.* (quoting *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007).

The third, catchall standard of causation, as most often applied by courts in this Circuit, requires a plaintiff to show that "the protected speech was a substantial or motivating factor in the alleged acts of retaliation." *Shehee v. City of Wilmington*, 67 F. App'x 692, 694 (3d Cir. 2003). The Third Circuit has further explained that "a plaintiff need not show that the decision was motivated solely by anti-speech animus, or even that the illegal animus was the dominant or primary motivation for the retaliation. This is less than a showing that a plaintiff's protected conduct was the 'but for' cause of the challenged actions." *Id.* (quoting *Suppan v. Dadonna*, 203 F.3d 228, 236 (3d Cir. 2000). As will be explained, *infra*, Plaintiffs' claims must proceed under this third theory of causation.

Given that the actions of the New Brunswick Police Department are not properly attributable to Mayor Cahill, as explained, *supra*, Plaintiffs' only remaining claim of retaliatory

conduct by the elected officials of New Brunswick is the denial of Plaintiffs' Application by the City Council. First, the timing of the Application's denial is not unusually suggestive of causation. The City Council's vote on Plaintiff's application was required to occur within 60 days of the filing of Plaintiffs' tax certificate, so either a favorable or adverse decision would have occurred within the same period. N.J.A.C. 13:2.7-7(d).  A denial within the 60 day period and roughly five months after the alleged act of protected speech is not "unusually suggestive" of a retaliatory motive. *DeFlaminis*, 480 F.3d at 268 (the timing of a school district's ruling on plaintiff's request could not support an inference of "unusual suggestive" timing because the district ruled on the request within the period in which it was legally required to do so).

Plaintiffs similarly fail to show a pattern of antagonism by Defendants Cahill and Recine during the period between the filing of Plaintiffs' Application and the adverse vote. Plaintiffs have not shown any interactions between Plaintiffs and either Mayor Cahill or Councilman Recine after the April meeting between Mr. Blatterfein and Mayor Cahill.[9] "Pattern of antagonism" causation requires repeated interactions of plaintiff and defendant. *See Marra*, 497 F.3d 286 (pattern of antagonism evidenced by series of escalating incidents between defendant and plaintiff including vandalization of plaintiff's computer and exclusion from work meetings); *Woodson v. Scott Paper Co.*, 109 F.3d 913 (3d Cir. 1997) (pattern of antagonism evidenced by gradual deterioration of relationship between plaintiff and defendant through series of discrete interactions culminating in alleged act of retaliation).

---

[9] Based upon the Mayor's comments regarding the Buck Foston's name, the April meeting can be viewed as antagonistic, but that meeting, standing alone, does not reflect a pattern of antagonism.

Turning to the catch-all theory, reviewing the record as a whole, the Court finds that Plaintiffs have raised a triable issue of material fact as to whether Councilman Recine, against whom there is no direct evidence of unconstitutional animus, was nonetheless influenced by or conspired with Mayor Cahill, against whom there is such evidence. While, it is undisputed that Plaintiffs have no personal knowledge of any improper influence by Mayor Cahill over the City Council vote, nor have Plaintiffs identified any witnesses purporting to possess such knowledge, [Blatterfein Dep., T106:7-10], the Court notes that in cases alleging unconstitutional influence and conspiratorial behavior by elected officials, an inference of improper influence must often, and may here, rest solely upon evidence of Defendants' conduct, the timing of such conduct, and indications of some retaliatory motive by one of the actors. *See Montone v. City of Jersey City*, 709 F.3d 181, 202 (3d Cir. 2013) (quoting *Stephens v. Kerrigan*, 122 F.3d 171, 181 (3d Cir. 1997)) ("[A] plaintiff in a First Amendment retaliation action may prevail [against defendant's motion for] summary judgment 'by discrediting [the defendant's] proffered reason [for the employment action], either circumstantially or directly, or by adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or substantial cause of the adverse action.'"). Because Plaintiffs' evidence of causation consists almost exclusively of circumstantial evidence of an unlawful agreement between, and cover-up by Defendants, evidence sufficient to show causation under *DeFlaminis* will also be sufficient to show conspiracy under *Startzell*.

As a preliminary matter, Defendants, in both their Motion and Response to the Statement of Facts, place great emphasis on the contention that Mr. Blatterfein could have obtained a liquor license transfer for the Bennigan's Property at a lower occupancy with the name "Buck

Foston's," which they argue negates the premise that the denial of the Application was based on the name in violation of the First Amendment. Specifically, Defendants argue:

> Plaintiff was offered the opportunity to use the name "Buck Foston" [sic] at the [Bennigan's Property], but with the occupancy limits imposed upon the prior tenant of the site instead of the doubled occupancy Plaintiff sought, and *Plaintiff turned it down*.

[Defendants' Brief, 15 (emphasis in original)]. Defendants' lone piece of evidence in support of this claim is a single statement in the deposition transcript of Mr. Blatterfein.[10] Significantly, Defendants have not provided any evidence of where the alleged offer was made to Mr. Blatterfein, when it was made, or by whom. The absence of any evidence –by way of deposition testimony from Defendants, declarations, or documents– confirming that such an offer was indeed made by any of the City officials is particularly striking and revealing. Plaintiffs, on the other hand, have introduced evidence to challenge Defendants' position, offering the deposition testimony of Mr. Blatterfein's lawyer, James Clarkin. It is undisputed that Mr. Clarkin handled the liquor license transfer application for Mr. Blatterfein, including negotiations with the City, and Mr. Clarkin strenuously denies ever having received such an offer. [Clarkin Dep., 26:11-16]. Defendants have not even provided the complete portions of the transcript surrounding Mr. Blatterfein's statement, making it even more difficult for the Court to discern his full meaning.

---

[10] In his deposition, Mr. Blatterfein was asked by defense counsel: "So it's fair to say that although you were offered to keep the same occupancy and internal configuration, and you would have a liquor licensed [sic] granted to you to be able to operate under the name Buck Foston [sic], you decided to decline that; is that correct?" [Blatterfein Dep., T125:15-20]. Plaintiffs' counsel immediately objected to the question because counsel was "unclear" where the factual basis of defense counsel's question was in the record. [*Id.* at 126:3-5]. Nevertheless, Mr. Blatterfein responded: "I could have accepted what they gave me." [*Id.* at 126:7]. After which defense counsel asked: "And you decided not to, correct?" Mr. Blatterfein answered: "Under the advice of counsel, under advice of architect, under advice of traffic engineering, and under the advice of five of the City officials who were charged with giving me that occupant load, well, four of them, I said I'm not willing to take it under these circumstances, absolutely." [*Id.* at 126 :9-17].

Ultimately, this Court finds that the record on this issue is unclear at best, and certainly not adequate to find that Defendants have shown no issue of material fact. There is a paucity of evidence to establish that an offer was made to Plaintiffs to receive a license for the Bennigan's Property at a reduced occupancy using the name "Buck Foston's." Furthermore, even if the record showed that the offer was made, there would remain a disputed issue of material fact as to whether Defendants were aware that the "Buck Foston's" project was not financially viable at the substantially reduced occupancy of the original Bennigan's Property.  By at least as early as June 29, 2011, Defendants had been served with Plaintiffs' Original Complaint, detailing the financial and contractual structure of the "Buck Foston's" project, particularly that the purchase price and financing agreement contemplated a sports bar serving up to 352 patrons, not 185. Thus, Defendants could have predicted that an offer by the City for a significantly reduced occupancy would have to be rejected by Plaintiffs as an illusory offer because it would be financially unsustainable, and such an "offer" could not therefore, as Defendants argue, negate any discriminatory motive to suppress the name "Buck Foston's."

Putting aside the alleged delays by the Police Department of Plaintiffs' background check or recommendation, the Plaintiffs rely on the following factual account to support their claims against Mayor Cahill and Councilman Recine. In April of 2011, Mr. Blatterfein's lawyer spoke with Mayor Cahill and Mr. Blatterfein himself met with the Mayor to discuss the "Buck Foston's" project. Mayor Cahill expressed his approval of the project from the perspective of economic development of the Bennigan's Property, but was strongly opposed to the project being named "Buck Foston's." In the months that followed, Mayor Cahill and Mr. Patterson discussed the Buck Foston's project on approximately ten occasions, during the course of one or two of which, the name "Buck Foston's" was discussed. At the request of Councilman Recine,

on June 16, 2011, Mayor Cahill, Councilman Recine, and Mr. Patterson met to discuss the Buck Foston's project. This meeting, called for the sole purpose of discussing a liquor license transfer application, was, according to the recollections of those present, the first of its kind in New Brunswick. Directly after the meeting, also on June 16, Mr. Patterson wrote a five-page memorandum, including a one page discussion of municipal ordinances governing signage and the Supreme Court case law governing regulations of commercial speech. Mr. Patterson included these in the memorandum because the issue of the "Buck Foston's" name had come up at the meeting.

Months later, when Buck Foston's LLC's Application finally came before the City Council, Councilman Recine voted to deny the place-to-place transfer that was necessary for "Buck Foston's" to operate as a sports bar. He claimed that concerns with alterations to the internal layout of the building and increases in traffic resulting from the increased occupancy motivated his decision. While this decision was consistent with the recommendation of New Brunswick Police Det. DeBonis, delivered in testimony before the Council, Councilman Recine's findings ran directly counter to all the other evidence submitted to the Council, including: (i) the recommendations of other City officials tasked with the responsibility to make findings based upon the layout and safety, (ii) the determination of the New Jersey Department of Transportation, which found no concerns regarding the anticipated increase in traffic, and (iii) the expert opinion of a professional transportation engineering firm. Detective DeBonis was not a traffic expert and he based his conclusions on his "common sense" evaluation of the relationship between occupancy and traffic. [Transcript of DeBonis, T35:8-20, hereinafter "DeBonis Dep."]. He also made it clear in his deposition, that if "Buck Foston's" had not sought to sell alcoholic beverages, the Police Department's recommendation on the project would not

have been required at all. [DeBonis Dep., T102:18-25, 103:1-5]. Indeed, the Police Department's usual non-involvement in reviewing occupancy changes is consistent with the guidance provided by the Alcoholic Beverage Control Handbook for Municipal Issuing Authorities. The Handbook does not mention occupancy or traffic concerns, and advises municipalities to investigate the criminal history and financial condition of applicants. Councilman Recine was almost certainly aware that traffic concerns generally lay outside the scope of license transfer proceedings, because he was advised as much in the June 16 Memorandum from Director Patterson, addressed to him and prepared immediately after a meeting at which he was present. [June 16 Memorandum, 2].[11] Based upon these undisputed facts, Plaintiffs contend that Defendant Cahill caused the City Council to deny Plaintiffs' Application either by directing the City Council to deny the application as his "agents," or by conspiring with Councilman Recine to have him vote to deny the application. [Amended Complaint, ¶ 73].

To determine whether a constitutionally permissible explanation is merely a pretext to conceal an unconstitutional motive, the Third Circuit has applied case law from the employment context to the "retaliatory refusal to grant a permit." *Phillips v. Borough of Keyport*, 107 F.3d 164, 181 (3d Cir. 1997). "Pretext may be shown by exposing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [official's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."

---

[11] The Court is mindful of the extensive New Jersey state case law cited by Defendants in support of the proposition that the New Brunswick City Council is entitled to broad discretion in the granting of liquor license transfers. Therefore, the Court highlights the absence of traffic concerns from the Alcoholic Beverage Control Handbook, and Defendants' own observation of this absence in the June 16 Memorandum, not to suggest that the City Council lacked the power to deny a transfer on the basis of a variety of concerns, but only to note that to do so in light of the other surrounding circumstances contributes to the inference of discriminatory motive requiring jury determination.

*Marra*, 497 F.3d at 306 (change in original) (quotations omitted). "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the [official] is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt." *Id.* Moreover, such inferences may properly be drawn on this motion from the undisputed facts and are sufficient to raise a material issue of fact as to causation in Plaintiffs' First Amendment retaliation claim.[12]

The timing of the June 16 meeting and the follow-up memorandum, including the discussion of the First Amendment concerns with the proposed name, when coupled with Councilman Recine's vote, which was against the weight of the credible evidence presented to the Council, are suggestive of an improper motive. This suggestion of improper motive is further bolstered by the additional facts that the incidence of such meetings and memoranda concerning liquor license transfers are unprecedented in New Brunswick, and the lone recommendation against the Application came from a Police Department addressing traffic issues outside of its purview.[13] Defendants attempted to show that no issue of material fact existed concerning

---

[12] The Court does not here decide the question of pretext in Plaintiffs' favor. Defendants have introduced significant evidence to rebut Plaintiffs' allegation. Councilman Recine had told Mr. Blatterfein months before the Application was filed that he was against changing the layout of the Bennigan's Property and indicated at the September 7 Council Meeting that his opposition to the project in part stemmed from his experience of traffic conditions near the Bennigan's Property because he lived on the same street. [Council Meeting Tr., T26:10-25, 27:1-4]. At the summary judgment stage, this Court, accordingly, only decides that in light of the evidence introduced by Plaintiffs and Defendants, a genuine issue of material fact exists to be decided by the jury.

[13] Indeed, although administrative remedies were not exhausted, see note 16 *infra*, I question, given the strong evidence that the Buck Foston's project would have no effect on area traffic, whether the Council's vote could have been sustained if an appeal to the Alcoholic Beverage Control had been pursued.

causation by introducing Councilman Recine's allegedly non-discriminatory explanation for his Council vote: concern over traffic and layout. But for this explanation to survive Plaintiffs' challenge, the trier of fact must believe that Councilman Recine either did not consult or gave no credence to the recommendations of the City's own traffic and safety officials, the New Jersey Department of Transportation, and a private traffic engineering firm, and chose instead to follow his own intuition and the recommendation of a police detective, who was not an expert in traffic engineering and not normally consulted about occupancy changes. No reasonable trier of fact must so conclude. It is for the jury to determine whether, in light of the facts and circumstances, Councilman Recine's determinations were pretextual.[14]

Moreover, whichever account the trier of fact choses to believe, as the sole witnesses to many of the central events in both Defendants' and Plaintiffs' accounts, the credibility of Mayor Cahill, Councilman Recine, and Director Patterson will likely decide the disposition of this claim. Such credibility determinations must be left for the jury. *Burton v. Teleflex Inc.*, 707 F.3d 417, 428-29 (3d Cir. 2013); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (internal citations omitted) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether

---

[14] Indeed, the facts of this case are fundamentally different from those in which the courts of this Circuit have granted summary judgment. In those cases plaintiffs have usually failed to show that defendants were even aware of plaintiffs' protected speech. *Ambrose v. Twp. of Robinson*, 303 F.3d 488, 493 (3d Cir. 2002) ("It is only intuitive that for protected conduct to be a substantial motivating factor in a decision, the decision makers must be aware of the protected conduct"); *See Reilly v. City of Atlantic City*, 532 F.3d 216 (3d Cir. 2008) (upholding District Court's denial of summary judgment where District Court found evidence supporting defendant's awareness of plaintiff's protected conduct, frustration with that conduct, and involvement in conspiracy to retaliate against that conduct); *Marra*, 497 F.3d 286 (upholding District Court's denial of defendant's motion for judgment where plaintiff introduced evidence of awareness, causation, and pretext, requiring jury determinations of credibility).

he is ruling on a motion for summary judgment, or for a directed verdict."); *Marino v. Industrial Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) ("In considering a motion for summary judgment a District Court may not make credibility determinations. . .").

In reaching this decision, the Court is mindful of the Third Circuit's admonition in *DeFlaminis*:

> A court must be diligent in enforcing these causation requirements because otherwise a public actor cognizant of the possibility that litigation might be filed against him, particularly in his individual capacity, could be chilled from taking action that he deemed appropriate and, in fact, was appropriate. Consequently, a putative plaintiff by engaging in protected activity might be able to insulate himself from actions adverse to him that a public actor should take. The point we make is not theoretical as we do not doubt that public actors are well aware that persons disappointed with official decisions and actions frequently bring litigation against the actors responsible for the decisions or actions in their individual capacities, and the actors surely would want to avoid such unpleasant events. . . . Courts by their decisions should not encourage such activity and, by enforcing the requirement that a plaintiff show causation in a retaliation case, can avoid doing so as they will protect the public actor from unjustified litigation for his appropriate conduct. In this regard we recognize that often public actors such as those in this case must make a large number of decisions in charged atmospheres thereby inviting litigation against themselves in which plaintiffs ask the courts to second guess the actors' decisions.

*DeFlaminis*, 480 F.3d at 267-68. While it is not the place of the Court to second guess the decisions of elected officials, at the summary judgment stage, the Court is also not permitted to make credibility determinations or weigh the evidence before it to resolve factual disputes.

Here, there is no dispute that Defendants were aware of Mr. Blatterfein's protected speech, and, as discussed *supra*, determinations of credibility reserved to the jury will play a central role in deciding the dispositive issue of causation based on the June 16 meeting, memorandum, September 7 vote, and surrounding circumstances. Viewing the evidence that can be gleaned from the record as a whole, there is a genuine issue of material fact as to the influence of Mayor Cahill over Councilman Recine, or the existence of an agreement between them, that is

sufficient to survive Defendants' Motion for Summary Judgment. Accordingly, the Court denies Defendants' Motion for Summary Judgment on Plaintiffs' First Amendment Retaliation Claim as asserted against Defendants Cahill and Recine.

C. Councilman Egan

On the other hand, the retaliation claim against Councilman Egan is devoid of any evidence in the record. In their Amended Complaint, Plaintiffs contend that "Defendants Recine and Egan (at the request and/or in coordination with Mayor Cahill and/or the City) had previously agreed" to vote in favor of the person-to-person transfer and against the place-to-place transfer and to offer a pretextual reason for doing so. [Amended Complaint, ¶ 67]. Unlike the evidence proffered alleging retaliatory conduct by Mayor Cahill and Councilman Recine, there is no evidence that Councilman Egan ever spoke to Mayor Cahill, [Egan Dep., T17:5-15], or Councilman Recine, [*Id.* at T17:16-19], about the Buck Foston's project prior to the City Council vote. Councilman Egan was not present at the June meeting between Councilman Recine and Mayor Cahill at which Buck Foston's was discussed [Recine Dep., T70:23-24], and he did not review either of the memoranda about Buck Foston's produced by Director Patterson. [Egan Dep., T17:24-18:2]. In his deposition, the councilman denied involvement in, or even communication about, any of the meetings, telephone calls, or written exchanges surrounding the "Buck Foston's" project. Plaintiffs have not offered any evidence to rebut this account. Bare assertions alone are insufficient to survive a motion for summary judgment. Accordingly, the retaliation claim against defendant Egan is dismissed.

D. City of New Brunswick

The Supreme Court has long held that there is no vicarious municipal liability in § 1983 cases. Rather, "[a] plaintiff seeking to impose liability on a municipality under § 1983 [must] identify a municipal policy or custom that caused the plaintiff's injury." *Kriss v. Fayette Cnty.*, 504 F. App'x. 182, 187 (3d Cir. 2012) (citing *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997)). [15] "'[A]n unconstitutional policy c[an] be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business.'" *Brennan v. Norton*, 350 F.3d 399, 428 (3d Cir. 2003) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. at 123). The Third Circuit has observed the Supreme Court's pronouncement of this theory of liability in *Pembaur v. City of Cincinnati*:

> [I]t is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances. No one has ever doubted, for instance, that a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body - whether or not that body had taken similar action in the past or intended to do so in the future - because even a single decision by such a body unquestionably constitutes an act of official government policy.

475 U.S. 469, 480 (1986) (citations omitted) (reproduced in *Brennan v. Norton*, 350 F.3d 399, 428 (3d Cir. 2003)). The first step in this Court's analysis is, accordingly, to determine whether Plaintiffs have identified a suitable final municipal policymaker.

---

[15] Plaintiffs' Amended Complaint references Subdivision O of Section 17.06.030 of the New Brunswick Code of Ordinances and the "City's general policy or practice of prohibiting signs or advertising of an indecent or obscene nature," but does not offer any evidence to show that the denial of Plaintiffs' Application was done in accordance with the ordinance, or that there were other incidents in which allegedly obscene advertising was suppressed, constituting a general city policy. [Amended Complaint, ¶ 72].

Plaintiffs have asserted that Mayor Cahill is the relevant policymaker where liquor license transfers are concerned. [Amended Complaint, ¶ 71].  It is, however, indisputable that the City Council, not the Mayor, has final decision making authority over such applications. N.J.S.A. 33:1-40 (vests discretion in the issuing, regulating, revoking, and transferring in the "governing board" of each of New Jersey's municipalities). Mayor Cahill is not a voting member of the City Council and cannot independently review the Council's decision to grant or deny a license. Nor are there any other higher officials within the municipality capable of reviewing the City Council's decisions on license applications.[16] For municipal liability purposes, therefore, the relevant policymaker is the New Brunswick City Council.

The Third Circuit found similarly in the case of *Walsifer v. Borough of Belmar*, 262 F. App'x 421 (3d Cir. 2008). In that case, plaintiff sought to establish municipal liability for the Borough Council's decision to promote another police officer instead of plaintiff. Plaintiff Walsifer introduced evidence that Police Chief Hill disapproved of Walsifer's Republican Party political affiliation, and recommended that someone other than Walsifer be promoted in retaliation for his expressions of political belief. The court found that the Borough Council was the final authority to establish municipal policy with regard to promotions in the police department, and, accordingly, in the absence of any official discriminatory policy, the Borough

---

[16] For municipal liability purposes the relevant inquiry is identifying the final decision maker within the municipality. It is undisputed that Plaintiffs failed to exhaust administrative remedies after the denial of their Application; an appeal to the State Division of Alcoholic Beverage Control was available and went unpursued. N.J.A.C. 13:2.7-7(d); [Blatterfein Dep., T87:11-14]. This is, however, unsurprising because Plaintiffs' contract to purchase the Bennigan's Property was contingent upon Buck Foston's LLC obtaining the liquor license transfer. Immediately after the Application was denied, Plaintiffs' land purchase contract, the closing date of which had been extended more than once, was canceled, leaving Plaintiffs unable to open a bar/restaurant at the Bennigan's Property. Even a successful appeal to the Alcoholic Beverage Control would have been fruitless, because Plaintiff would not own the property to which the license would have been transferred.

itself could only be held liable for the actions of the Council. *Id.* at 424. Similarly, here, having determined that the City Council is the relevant policymaker for municipal liability purposes, the Court must next ascertain whether Councilman Recine's vote to deny the Application is attributable to the City Council as a whole.

To approve or deny a liquor license transfer in New Brunswick, a majority of the City Council is required. "[O]nly those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability." *LaVerdure v. County of Montgomery*, 324 F.3d 123, 125 (3d Cir. 2003). The Third Circuit has interpreted this standard to mean that, in the case of a multi-member body, the majority, rather than any individual member is the final policymaker for municipal liability purposes. *Id.* In a recent unreported decision, the Third Circuit refined its holding in *LaVerdure*, explaining that the single vote of a councilman motivated by retaliatory animus did not give rise to a cause of action under the First Amendment when the final vote was five councilmen adverse to plaintiff and one in favor. Because changing the biased vote would not have altered the vote's outcome, the court determined that the one biased vote alone was not the cause of plaintiff's injury. Adopting the reasoning of the Second Circuit in an earlier case, the Third Circuit opined:

> [I]f a majority of defendants prove that their individual votes against the plaintiff would have been the same irrespective of the plaintiff's protected conduct, then the defendants as a group cannot be held liable, and no individual defendant, even one whose proof falls short, can be so held *because causation is absent*. . . . [E]ven if some defendants based their decision solely on impermissible grounds, a finding that a majority of defendants acted adversely to plaintiff on legitimate grounds is sufficient for all to escape liability.

*Watson v. Borough of Susquehanna*, 2013 WL 3803893 (3d. Cir. Jul. 9, 2013) at *2 (emphasis added). "[T]he impartiality of the other Council members' votes nullified Defendant['s] unlawfully motivated vote. *Acting alone, he could not have violated Plaintiff's First Amendment*

*rights.*" *Id.* (emphasis added). This reasoning is consistent with the court's holding in *LaVerdure*, where the three member municipal board had voted unanimously against plaintiff, so the tainting of any one vote by retaliatory animus would not undermine the legitimacy of the surviving, untainted two-vote majority.

Here, the situation is different than in *LaVerdure*, because, while I have found that there is no evidence of discriminatory animus motivating the negative vote of Councilman Egan, the remaining member of the Council voted in favor of Plaintiffs. Therefore, Councilman Recine's vote, one of the two in the majority adverse to Plaintiffs, determined the vote's outcome. Stated differently, taking the votes of the unbiased council members as fixed, Councilman Recine, acting alone, could have brought about the denial of the Application, violating Plaintiffs' First Amendment rights. The logic of *LaVerdure* and *Watson* governs this case. A policymaker can bind a municipality by his decision where that policymaker's direct action caused the municipal action adverse to plaintiff. *Compare LaVerdure*, 324 F.3d at 125 (where the policymaker is the lone biased vote in a unanimous majority, there is no municipal liability, because the single vote did not cause the municipal action).

Since Councilman Recine was a member of a two-vote majority adverse to Plaintiffs, his vote was capable of setting municipal policy under the single act theory because, acting alone, he could commit the municipality to an official action. Accordingly, because Plaintiffs have introduced genuine issues of material fact as to their First Amendment Retaliation claim against Councilman Recine and Mayor Cahill, the City of New Brunswick cannot be dismissed from the action until the jury has decided the issue of Councilman Recine's retaliatory animus. Stated differently, as the deciding vote in the majority, Councilman Recine's motivation is properly

imputed to the City Council, which, under *Brennan v. Norton*, is the final policymaker for First Amendment purposes. Defendants' Motion on Plaintiffs' retaliation claim against the City of New Brunswick is, therefore, denied.

VII. Fourteenth Amendment Equal Protection Claim

Defendants' Motion for Summary Judgment on Plaintiffs' equal protection claim is granted as to all defendants because (A) the delay and denial claims are duplicative of Plaintiffs' First Amendment retaliation cause of action against Councilman Egan, (B) the delay claim lacks an adequate basis in the record to establish liability for all other Defendants, and (C) Plaintiffs have failed to produce evidence of similarly situated entities in their denial of the application claim against all other Defendants.

A. Claim Against Egan

As a preliminary matter, to state a valid claim under the Equal Protection Clause a plaintiff must do more than merely rephrase his or her First Amendment retaliation claim. *Oras v. City of Jersey City*, 328 F. App'x. 772, 775 (3d Cir. 2009) (citing *Thomas v. Independence Twp.*, 463 F.3d 285, 298 n. 6 (3d Cir. 2006) ("[A] pure or generic retaliation claim . . . simply does not implicate the Equal Protection Clause.")(internal quotations omitted)). As to Councilman Egan, where, as here, Plaintiffs' "First Amendment and Equal Protection claims are functionally identical . . .[,] it would be redundant to treat them separately." *Hill v. City of Scranton*, 411 F.3d 118, 125-26 (3d Cir. 2005). The Third Circuit has explained the logic of this measure at length:

> As a leading treatise explains, "[i]t is generally unnecessary to analyze laws which burden the exercise of First Amendment rights by a class of persons under the equal protection guarantee, because the substantive guarantees of the Amendment serve as the strongest protection against the limitation of these rights." Ronald Rotunda & John Nowak, 3 Treatise on Constitutional Law: Substance and Procedure § 18.40, at 796 (3d ed.1999). If a law passes muster under the First Amendment it is also likely to be upheld under the Equal Protection clause. *Id.* Likewise, if a law violates First Amendment rights there is no need to resort to the Equal Protection clause to redress the constitutional violation. *Id.; see also Sherbert v. Verner,* 374 U.S. 398, 410 (1963) (no need to examine equal protection claim based on denial of unemployment benefits to individuals whose religious principles prohibit Saturday work where Court held same practice unconstitutional under free exercise clause).

*Hill v. City of Scranton*, 411 F.3d 118, 125-26 (3d Cir. 2005). The analysis in *Hill* applies equally to official conduct, because "[d]iscriminatory enforcement of a facially valid law is also unconstitutional under the equal protection clause." *Id.*; *See Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886); *Holder v. City of Allentown*, 987 F.2d 188, 197 (3d Cir. 1993) (applying *Yick Wo* to a claim of discriminatory enforcement of a residency ordinance). Accordingly, the disposition of Plaintiffs' Equal Protection claim against Councilman Egan will mirror that of Plaintiffs' retaliation claim. As no evidence has been introduced to support either claim against Councilman Egan, judgment is entered for Councilman Egan on Plaintiffs' Equal Protection claim as well.

B. Delay Claim against Cahill, Recine, and City of New Brunswick

1. Mayor Cahill and Councilman Recine

Plaintiffs' equal protection claim against Mayor Cahill and Councilman Recine arising from the alleged delay of the Application fails for the same reasons stated in the discussion of the First Amendment, *supra*. Because there is no evidence, either direct or circumstantial, tending to show that Mayor Cahill either directed or acquiesced in the Police Department's alleged delay of Plaintiffs' background check and application review, Mayor Cahill has no individual liability on

this basis. As to Councilman Recine, Plaintiffs have not alleged any involvement with the Police Department, and certainly have not introduced any evidence showing such involvement.  He too, therefore, incurs no liability for the alleged delay.

2. City of New Brunswick

Unlike the dearth of evidence concerning any connection between the named individual defendants and the Police Department, Plaintiffs have offered evidence of delaying actions by officers of the Police Department, itself a subdivision of the City of New Brunswick.[17] Both the Alcoholic Beverage Control Manual and the June 16 Memorandum drafted by Director Patterson suggest that occupancy and traffic concerns are not within the scope of the Police Department's background check and recommendation process. [June 16 Memorandum]. Nevertheless, Det. DeBonis conducted a traffic safety study on the area surrounding the Bennigan's Property. [Council Meeting Tr., T27:14-25, 28:4-15]. Plaintiffs have also shown that on at least two occasions, the Police Department rendered its recommendation on a license transfer prior to the receipt of an applicant's tax certificate, and on several occasions, the Department conducted a background check and processed a recommendation in fewer than 100 days. [Plaintiffs' Exhibit NN: Police Department's Recommendation of Application Status dated October 4, 2006; Plaintiffs' Exhibt OO: Tax Clearance Certificate dated January 24, 2007; Plaintiffs' Exhibit SS: Police Department's Recommendation of Application Status dated December 17, 2004; Plaintiffs' Exhibit TT: Tax Clearance Certificated dated April 13, 2005]. Nevertheless, the

---

[17] The United States Supreme Court determined that municipal corporations are "persons" subject to liability under the Civil Rights Act in *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 685 (1978). Municipal police departments, by contrast, have no separate identity from the municipalities of which they are subdivisions and are not "persons" subject to § 1983. *Martin v. Red Lion Police Dep't*, 146 F. App'x 558, 562 n. 3 (3d Cir. 2005).

Department insisted on receiving Buck Foston's LLC's tax certificate before giving its recommendation to the Council, and took 155 days to render its final, and adverse, recommendation on the project.[18]

Plaintiffs' evidence at least raises the specter of an equal protection claim, under a theory of selective enforcement, against Det. DeBonis, Police Chief Caputo, and perhaps other unnamed officers involved in the handling of the Buck Foston's Application. *Prof'l Dog Breeders Advisory Council, Inc. v. Wolff*, 752 F. Supp. 2d 575, 595 (E.D. Pa. 2010) (internal citations omitted) ("To establish selective enforcement, it must be shown that: "(1) the plaintiff, compared with others similarly situated, was selectively treated; and (2) the selective treatment was motivated by an intent to discriminate on the basis of impermissible considerations, such as . . . to punish or inhibit the exercise of constitutional rights."). Even presuming, without deciding, that Plaintiffs have shown that they were treated differently than similarly situated entities in the processing of their Application by officers of the Police Department,[19] the problem remains for Plaintiffs that neither Det. DeBonis, Chief Caputo, nor any other officers are named defendants in this action. As explained above, there is no vicarious liability for municipalities under § 1983. *See Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997). Accordingly, even a potential showing of discriminatory treatment by police officers is insufficient to show discriminatory treatment by the City of New Brunswick. To implicate the Police Department,

---

[18] Defendants argue that Plaintiff has cherry-picked the fastest Police Department reviews of liquor license transfer applications in City history, but offer no specific counterexamples to support this contention.

[19] The Court does not reach the issue whether Plaintiff has identified similarly situated parties for the purpose of the processing of Plaintiffs' background check and recommendation by the Police Department, because the City is not otherwise liable for the actions of any individual police officers. See discussion, *infra*.

and by extension the City, Plaintiffs must show that either a policy or custom of the City motivated the conduct of the individual officers. For example, this could have been done by showing a pattern of delay by the Police Department in processing applications with arguably "offensive" names, or that Chief Caputo or Mayor Cahill, as a final policymaker for the Department directed or acquiesced in the delay because of the name "Buck Foston's." *See Watson v. Abington Twp.*, 478 F.3d 144, 155-56 (3d Cir. 2007).[20] After full discovery, Plaintiffs have not produced the evidence necessary to show a discriminatory policy or custom, and the City of New Brunswick cannot, accordingly, be held liable under § 1983 for the actions of Det. DeBonis or its other police officers.

C. Absence of Similarly Situated Entities for Denial Claim

Whereas the alleged delay of Plaintiffs' Application was brought about by subordinate officers of the municipality, which, due to the absence of vicarious liability in § 1983 cases, could not expose Mayor Cahill, Councilman Recine, or the City to liability on the facts in the record, the denial of the Application was allegedly brought about by the direct action of a conspiracy among the municipality's final policymakers. For the denial claim, therefore, there is no issue of vicarious liability. Nevertheless, Plaintiffs' equal protection claim against Mayor

---

[20] "[T]here are two ways that a plaintiff can establish municipal liability under § 1983: policy or custom. Under *Monell*, a plaintiff shows that a policy existed 'when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict.' *Bielevicz*, 915 F.2d at 850 (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir.1990) . . . . A plaintiff may establish a custom, on the other hand, 'by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law.' *Id.* (citing *Andrews*, 895 F.2d at 1480). In other words, custom may be established by proving knowledge of, and acquiescence to, a practice. *Fletcher v. O'Donnell*, 867 F.2d 791, 793-94 (3d Cir.1989)." *Watson,* 478 F.3d at 155-56.

Cahill, Councilman Recine, and the City of New Brunswick arising from the denial of the Application fails because the record contains insufficient evidence of similarly situated entities.

The Court of Appeals for the Third Circuit has stated that a court's "first step in evaluating a claim that a law or government action violates the Equal Protection Clause is to determine the appropriate standard of review." *Donatelli v. Mitchell*, 2 F.3d 508, 513 (3d Cir. 1993) (citation omitted). Defendants correctly cite the standard for a "class of one" Equal Protection challenge when a plaintiff alleges that he or she has been singled out for unfair treatment that is "irrational and wholly arbitrary." The Third Circuit has held that "to state a claim under [the class of one] theory, a plaintiff must allege that (1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006) (interpreting *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000)).

This standard, however, only applies in cases in which plaintiff alleges conduct *not motivated* by plaintiff's exercise of a protected constitutional right. *Eichenlaub v. Township of Indiana*, 385 F.3d 274, 286 (3d Cir. 2004). According to Plaintiffs, the denial of Buck Foston's LLC's liquor license transfer was motivated by, and designed to burden, Plaintiffs' First Amendment right to name their restaurant "Buck Foston's." [Amended Complaint, 23 n. 5]. Because the First Amendment protects such commercial speech, the City Council's denial is subject to a higher level of scrutiny. Regardless of the level of scrutiny that this Court employs, however, Plaintiffs' claim fails because the Record contains insufficient evidence of similarly situated entities, which is the next step in the equal protection analysis under any standard. For example, "the first inquiry a court must make in an equal protection challenge to a zoning

ordinance is to examine whether the complaining party is similarly situated to other uses that are either permitted as of right, or by special permit, in a certain zone. If, and only if, the entities are similarly situated, then the city must justify its different treatment of the two, perhaps by citing to the different impact that such entities may have on the asserted goal of the zoning plan." *Congregation Kol Ami v. Abington Twp.*, 309 F.3d 120, 137 (3d Cir. 2002). The facts in the present case are sufficiently similar to those of *Congregation Kol Ami*, to extend the logic applied in the zoning context to the licensing context.

"Persons are similarly situated under the Equal Protection Clause when they are alike in all relevant aspects." *Startzell v. City of Philadelphia, Pennsylvania*, 533 F.3d 183, 203 (3d Cir. 2008) (internal quotations omitted). Plaintiffs assert that for Fourteenth Amendment purposes, the relevant category of similarly situated liquor license applicants are those who also exercised their First Amendment right to speech in choosing to name their restaurants. According to Plaintiffs then, all businesses applying for liquor licenses in the City of New Brunswick are similarly situated to "Buck Foston's LLC," because, by the very nature of a license application, every applicant must have a name. This Court disagrees.

Plaintiffs have not established that those entities, whose owners also exercised their constitutional right to name them, are "alike in all relevant aspects" under the *Startzell* standard. The Third Circuit consistently requires some additional showing beyond a plaintiff's assertion that other entities are of the same general category as plaintiff (e.g. employees, property owners) and engaged in the one similar incidence of conduct giving rise to plaintiff's cause of action (e.g. applying for a permit, canceling a lease). *See Abrams v. Port Auth. Trans-Hudson Corp.*, 445 Fed. Appx. 537 (3d Cir. 2011) (plaintiff failed to show other employees subject to employment

actions were "alike in all relevant respects" where no evidence was introduced that those employees also shared plaintiff's physical condition/disability); *Rucci v. Cranberry Tp., Pa.*, 130 Fed. Appx. 572 (3d Cir. 2005) (plaintiff failed to show other property owners subject to street access regulation were similarly situated where other landowners were not shown to have also subdivided their properties in the same manner as plaintiff); *Adams Parking Garage, Inc. v. City of Scranton*, 33 Fed. Appx. 28 (3d Cir. 2002) (plaintiff failed to show another leaseholder subject to termination was similarly situated where the other leaseholder's lease contained a termination clause absent from plaintiff's). I need not rely on this general trend in precedents alone, because, as explained below, the Third Circuit has provided more specific guidance as to what kinds of additional characteristics must be shown by equal protection plaintiffs.

The Third Circuit rule of law most directly barring Plaintiffs' equal protection claim from going forward is that enunciated in the case most heavily relied upon by Plaintiffs in support of their claim, *Congregation Kol Ami*. There, the Third Circuit reversed and remanded the District Court's grant of summary judgment for plaintiff on an equal protection claim, because the District Court had not adequately determined that plaintiff was "similarly situated" to the other entities named in the complaint.  In reaching its decision, the Circuit Court instructed that District Courts must not only inquire as to "whether the two entities have the same impact" on the surrounding community, but whether the other entities are similar in "scale," "purpose," and "intensity" of land use. *Congregation Kol Ami*, 309 F.3d at 139; *Id.* at 142.

As in the case now before the Court, increases in traffic from plaintiff's proposed development project were a major point of contention between the parties in *Congregation Kol Ami*. The Third Circuit found it appropriate and necessary for the District Court to consider the

number of people visiting the plaintiff's proposed property by car as well as the timing and frequency of their comings and goings. *Id.* at 139, 142. While Plaintiffs here have produced substantial evidence of the "Buck Foston's" project's hypothetical impact on the area surrounding the Bennigan's Property and of Plaintiffs' expansion plans, they have failed to provide any like information about the allegedly "similarly situated" other applicants. Instead they have rested their equal protection claim solely on a showing of differing treatment (*e.g.* length of application processing prior to the City Council's vote, status of tax certificates), giving short shrift to the antecedent question of similarly situated entities. [Plaintiffs' Opposition Brief, 19-23].

Because the Third Circuit had not yet explicitly stated the "alike in all relevant respects" standard at the time of *Kol Ami*, this Court also finds instructive the discussion of more recent Fourteenth Amendment equal protection law post-*Startzell*. For Example, in *Warren v. Fisher*, the District Court found that a Plaintiff had failed to identify similarly situated parties when it alleged no facts suggesting "operations . . . similar in kind or scope or impact on the Township," nor any facts that the other allegedly similarly businesses "sought to expand operations in a similar way to Plaintiffs." 2013 WL 1164492 (D.N.J. Mar. 19, 2013) at *9. The court in *Warren* found support for denial of plaintiff's claim in the Third Circuit case of *Perano v. Township of Tilden*, 423 Fed. Appx. 234 (3d Cir. 2011). In that case, the Third Circuit affirmed the dismissal of the equal protection claim of a developer seeking to expand his mobile home park who failed to allege specific facts showing the other "similarly situated residential and commercial developers" to be alike in all relevant aspects. *Id*. at 238. The decision in *Perano*, although at the stage of a motion to dismiss rather than summary judgment, is consistent with the factors enunciated in *Congregation Kol Ami*. Without evidence as to impact, purpose, scope, and

intensity of use no finder of fact can determine if a plaintiff and other entities named in a plaintiff's complaint are similarly situated.

Plaintiffs' proofs regarding similarly situated entities fare no better than the plaintiffs in *Warren* and *Perano*. The record shows that Plaintiffs here sought to expand the bar and restaurant business on the Bennigan's Property. While in operation, Bennigan's had one bar and a maximum occupancy of 185 [DeBonis Dep., T34:22-25]. Plaintiffs sought to change the layout of the building to create three bars and increase the occupancy to 352 persons. [Proposed Renovation to Existing Building by James P. Kissane, Architect]. This expansion was cited by Defendants as the reason for denial of a liquor license. [Recine Dep., T43:2-4, 46:1-9; Egan Dep., T9:4-12, 7:10-23]. [21] In identifying similarly situated parties, it is insufficient for Plaintiffs to introduce, wholesale, examples of named businesses that also applied for licenses.[22] The relevant category of businesses "alike in all relevant respects" must include applicants who presented expansion plans including increased occupancy, alteration to internal layout, or other change affecting the impact, purpose, scope, and/or intensity of the project. *See Congregation Kol Ami*, *supra*. Plaintiffs do not do so and, accordingly, fail to show the existence of similarly situated parties. Their equal protection claim is dismissed.

---

[21] Plaintiffs argue that Defendants' alternative reasons for denial are mere pretext to cover up their unconstitutional motive to suppress speech. The court does not reach this argument in the equal protection context because, prior to the analysis of Defendants' motive, the claim fails based upon the absence from the record of similarly situated applicants.

[22] Plaintiffs contributed information to the record showing how long it took for the other businesses' applications to be considered relative to their date of filing and the date at which they submitted their tax certificate. [*See* Plaintiffs' Supplemental Exhibits AA-HH]. This showing is insufficient and not relevant to the denial claim.

VIII. New Jersey State Constitutional Claims

A. First Amendment Retaliation

The Supreme Court of New Jersey has held that the analysis of Article I, paragraph 6 claims is functionally identical to federal First Amendment analysis.[23] As such, the disposition of Plaintiffs' state law retaliation claim mirrors that of Plaintiffs' federal law claim. Defendants' Motion is granted with respect to Councilman Egan, but denied as to all other defendants consistent with the First Amendment analysis, *supra*.

B. Equal Protection

"Although, the phrase equal protection does not appear in the New Jersey Constitution, it has long been recognized that Article I, paragraph 1, of the State Constitution, 'like the fourteenth amendment, seeks to protect against injustice and against the unequal treatment of those who should be treated alike. " *State v. O'Hagen*, 189 N.J. 140, 164 (2007) (internal citations and quotations omitted). Article I, Paragraph 1 provides:

---

[23] "Article I, Paragraph 6 of the New Jersey Constitution provides: 'Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press.' *N.J. Const.* art. I, ¶ 6. Because we ordinarily interpret our State Constitution's free speech clause to be no more restrictive than the federal free speech clause, *Shelton College v. State Bd. of Educ.*, 48 *N.J.* 501, 518, 226 *A.*2d 612 (1967), '[w]e rely on federal constitutional principles in interpreting the free speech clause of the New Jersey Constitution.' *Karins v. City of Atlantic City*, 152 *N.J.* 532, 547, 706 *A.*2d 706 (1998); *see Bell v. Township of Stafford*, 110 *N.J.* 384, 393, 541 *A.*2d 692 1988) (stating that constitutional approach taken by United States Supreme Court when examining commercial speech conforms to our own)." *Hamilton Amusement Ctr. v. Verniero*, 156 N.J. 254, 264-65 (1998).

> All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness.

[N.J. Const. art. I, ¶ 1]. The New Jersey Supreme Court has interpreted this provision to require a three-part test to evaluate challenged statutes and state actions. New Jersey courts decide such challenges by weighing three factors: (1) the nature of the right asserted; (2) the extent to which the statute intrudes upon that right; and (3) the public need for the intrusion. *Sojourner A., supra,* 177 N.J. at 333, 828 *A*.2d 306. While the New Jersey test is not identical to that under the Federal Constitution, "[t]o a large extent, the considerations guiding our equal protection analysis under the New Jersey Constitution are implicit in the three tier approach applied by the Supreme Court under the Federal Constitution," *Barone v. Dept. of Human Servs.*, 107 N.J. 355, 526 (N.J. 1987), and the "tests weigh the same factors and often produce the same result." *O'Hagen*, 189 N.J. at 165; *accord Brown v. City of Newark*, 113 N.J. 565, 552 (N.J. 1989).

Applying the New Jersey factors, the Court finds nothing in the nature of Plaintiffs' claim of protected commercial speech, the extent of the intrusion upon that right by Defendants' alleged unconstitutionally motivated denial of Plaintiffs' Application, or the interests of the public in liquor license transfers to suggest that the analysis under the federal constitution, *supra*, should not also hold true in dismissing Plaintiffs' state constitutional equal protection claim. Plaintiffs' state constitutional claim, therefore, is also dismissed.

Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part.  Judgment is entered for Defendant Egan, dismissing all claims against him. Judgment is entered for Defendants Cahill, Recine, and City of New Brunswick on Plaintiffs' federal and state equal protection claims as well as Plaintiffs' federal and state First Amendment retaliation claims arising from the conduct of the New Brunswick Police Department in delaying the consideration of Plaintiffs' Application. Defendants' Motion for Summary Judgment is denied on Plaintiffs' federal First Amendment and state Article I, paragraph 6, retaliation claims against Defendants Cahill, Recine, and City of New Brunswick arising from the denial of Plaintiffs' Application.

Dated: _____9/27/2013_____          _____/s/ Freda L. Wolfson_____
                                       The Honorable Freda L. Wolfson
                                       United States District Judge